And then the court take a recess and resume with the final three. It's called case number four, please. The next case for argument is 164204 Northern District of Iowa. Patricia Jensen versus IOC Black Hawk County Inc. Mr. Lyons, when you're prepared. May it please the court. Mr. O'Keefe. My name is Aaron Lyons and I represent the plaintiff appellant in this matter. Ms. Jensen is appealing from the grant of summary judgment against her in this Title VII and Iowa Civil Rights Act retaliation case. In order to prove her retaliation case, Ms. Jensen must show three things. That she engaged in protected conduct, that she suffered a materially adverse employment action, and that the materially adverse employment action was causally linked to the protected conduct. The defendant has conceded, at least for the purposes of this motion, that Ms. Jensen engaged in protected conduct and that she suffered a materially adverse employment action. And so the fighting issue in this case is the causal link between the two. Ms. Jensen can establish a causal link under either the federal determining factor standard or the new state of Iowa standard as of 2017, the motivating factor standard. First, she can establish that the reason that the determination was not true. This court has held that an employee can withstand summary judgment in a retaliation case by showing that the employer's proffered explanation is unworthy of credence because it has no basis in fact. That's the Lors versus Dean case. And that the non-moving party is entitled to all favorable inferences that the false reason given makes the real reason intentional discrimination if the proffered reason is shown by conflicting evidence to be untrue. That's the Bassett case. In this case, the appellee is arguing that Ms. Jensen went to her boss in the security department at the Isle of Capri Casino and asked him to intervene in another employee's relationship with yet another co-employee that he refused to intervene and instructed her not to say anything more about it. And under the appellee's version of the facts, she then went and did exactly what she was just told not to do, resulting in her termination for insubordination. However, the defendant has the timeline entirely reversed, which changes everything. Both Ms. Jensen and the other co-employee that was involved in that conversation testify that there was only ever one conversation between the two of them about the topic of the younger co-worker's relationship. That occurred at the casino's turnstiles and it occurred before Ms. Jensen ever went to talk to her supervisor in the security department about this younger co-worker's relationship. Ms. Jensen found out about this younger co-worker's relationship in the context of that conversation at the casino's turnstiles. And so if that conversation happened after the conversation with the security supervisor, then Ms. Jensen would not have had the information that she would have needed to have that conversation with a just doesn't make logical sense. How much time elapsed from the protected activity and the termination? She complained about the security supervisor's sexually inappropriate language in late March. He was terminated in early April and Ms. Jensen's termination was final as of at least August 30th. So four months to five months, something like that. Ms. Jensen does not argue that this is a case where the timeline, the closeness in time between the protected conduct and the adverse employment action is determinative. The cases in that regard hold pretty clearly that the adverse employment action must follow very closely after the protected conduct in order for just that timeline alone to be determinative. So Ms. Jensen does need to show more and indeed she can. She can show that the reason for her termination was false. She was never in fact subordinate. Mr. Taylor, the security department supervisor, suggested in their light-hearted joking conversation in the security office that day that maybe she shouldn't talk to Ms. Nyland, the younger co-worker, about it. Now Ms. Jensen didn't take that as an authoritative direction, but even if she didn't take it as an authoritative direction, she never again had a conversation with Ms. Nyland on the topic of her relationship. Even if it was a directive, she followed it. But what information did the company have that led it to think she disregarded the order? Ms. Nyland, the younger co-worker, left the understanding, I suppose, what Ms. Jensen was was getting at, but still bothered by the conversation. So much later, I believe the same day, but later on the same day, she called and left a voicemail for the employee relations manager complaining about the conduct. And the manager with the impression that the conversation happened after the order was given. Is that how we got in? That's a possibility. It's a possibility that because her complaining phone call happened in the timeline after the conversation between Ms. Jensen and Mr. Taylor in the office, they were confused and thought the complaint was coming about behavior after that conversation. Isn't that what they say when they terminated her? They understood that she had disobeyed this order by talking to Nyland again. That was the stated reason for the termination. Now, the problem with that is, number one, they don't concede at any point, either below or in this appeal, that they could have made a mistake. They're adamant that their timeline is the correct timeline, despite Ms. Jensen's testimony and Ms. Nyland's testimony. Why is that material? Whether they were factually correct or not, as long as they were acting on a belief that she violated the order. The point, Judge Colleton, is that if they were mistaken and they terminated Ms. Jensen for just a mistaken reason, that's no good for Ms. Jensen, obviously, but it's not an illegality. Where's the real proof of a retaliatory motive on the part of the company? There's several items of proof. First, if they had made a mistake, if they had just misunderstood the timeline, there would be no reason for them to persist after their error was exposed in arguing that their timeline was, in fact, correct. There also would have been no reason for them to ... And if that was the only factor, then that might be an explanation, but there's more. The behavior that they manifested at the time of the termination was very odd. This conversation, the term styles, happened on August 23rd. The termination paperwork that you can see at pages 83 and 84 and 167 of the appendix was filled out and dated on August 26th, 2017, so they had, in some way, decided that they were going to terminate her as of August 26th, 2017. The next day, August 27th, 2011 ... I'm sorry, I may have been saying 2017. The next day, August 27th, 2011, Dave Taylor calls Ms. Jensen and tells her that she's on a three-day suspension while they investigate the claim against her, when just the day before they had already filled out her termination paperwork. I'm still asking, what's the proof of a connection between her protected activity and the eventual termination? In the few months that intervened between the protected conduct and the termination, Ms. Jensen believed that other employees were, quote-unquote, out to get her, and that is not ... How is that attributable to the company? Well, it's attributable to the company because both Mr. Stanford and Mr. Taylor, in their depositions in this case, confirmed that that was, in fact, true, that they were aware that people had a grudge against ... Well, their awareness of it doesn't mean that they didn't prove they were participants in it. Sure, but they were aware that this was going on, and then another security supervisor, this Brian Lucas, told a friend of Ms. Jensen's, also watch out, they're out to get you because of what happened with ... When he says they, are they talking about coworkers who were displeased in losing someone they enjoyed working with? And what I've argued in my brief is that they can only include the people who have the power to terminate her because otherwise they might hold a grudge against her, but they couldn't, quote-unquote, get her unless they had the power to terminate. And so all of this ... So there was an atmosphere of retaliation that existed. And when you combine that with the odd facts surrounding her termination, that they suspended her for three days pending an investigation when they had already filled out her termination paperwork, and that the reason for the termination is demonstrably false, all of that adds up to a circumstantial, I grant you, but nevertheless strong case on which a reasonable jury could determine that retaliation was either the determining factor or the motivating factor in Ms. Jensen's termination. During your rebuttal time, you can continue. Yeah. I'd like to reserve the rest of my time for rebuttal. Thank you. Mr. Lyons. Mr. O'Keefe. Thank you, Your Honors. May it please the Court, Counsel. There was some discussion in the briefing and there were some more recent filings about a change in the Iowa standard of proof on retaliation cases, but we would submit this isn't about a standard of proof. Frankly, I don't think she can make her case under any standard of proof. In our view, this case is about a failure of evidence. And it's exactly on the points, Judge Smith and Judge Carlton, that you noted. The plaintiff just simply doesn't have enough evidence to bridge the gap that there was some retaliatory motive on behalf of the decision makers that made the decision to terminate her employment. Counsel concedes in his argument. We've argued in the brief. The district court found that timing isn't enough. There was a second evidentiary argument about alleged nitpicking on some of the prior progressive discipline. The district judge noted that plaintiff doesn't deny that she engaged in the underlying activity, just characterizes it that it shouldn't have been used against her in this way. Notably, there's no evidence of comparators on any of these points. In other words, there isn't any evidence that other people were treated differently under similar facts on any of the progressive disciplinary issues. The timeline problem is exactly what you said, Judge. The two decisions . . . Was there a mistake in the company's view or not? In the company's view, no. The HR people who testified in our case believed that they have the timeline correct. However, the plaintiff and Ms. Nylund testified to a different recollection. In our view, that recollection is probably mistaken and was recanted, albeit truthfully, but mistakenly in their respective depositions. But in the end, it doesn't matter because there's no evidence that the information that he knows he told her not to do it. So in his mind, even if you accept the mistakes as truth in the deposition testimony . . . Don't we have to at this point? Yeah, sure, absolutely. I'll concede that for purposes of summary judgment, but it doesn't make a difference because from Taylor's point of view, he told Jensen not to discuss this with Officer Nylund's. And he received notice after that conversation that she had. He viewed that as insubordination and that insubordination was the third strike and ultimately led to her termination. The district judge, I thought, summed it up very, very well. And her discussion on that is found both in the prima facie part of the case and also in the pretext part of the case. But she said, you know, it's the old Hudson versus McDonnell Douglas standard that this court is well familiar with. You know, the Eighth Circuit's not going to sit as a super personnel department on these issues. You know, the question isn't whether we got it right. The question isn't whether a mistake was made. The question is whether we did something unlawful. Was there something retaliatory? You know, interestingly, the testimony with regard to the two decision makers in the deposition, which is found at the appendix at 45, you know, question. Was there ever a point in time where you thought either Mr. Taylor or Mr. Stanford were behaving inappropriately with regard to you as a result of some bias from the TJ investigation? Answer, never. Okay? Other than the co-workers you know, so Michael George, for example, is one. I think you said that a couple of times where you didn't know the name but other co-workers who were partial to TJ and perhaps Shelly Pratt as you set forth in your statement. Are there any other individuals specifically at the Al Capri whom you believe had some issue with you as a result of the complaint against TJ? Answer, no, I don't. Okay, again, I'm just trying to confirm my record here. My record is that Michael George and the other unnamed co-workers on the third shift and perhaps Shelly Pratt. Answer, yes. And no others that you ascribe that issue with. You know, that was her testimony. She tried to clean that up in a self-serving declaration when she said that her landlord, who incidentally wouldn't submit a declaration in the district court, but she said that her landlord would come to testify at trial, that her tenant, Brian Lucas, told the landlord to tell Ms. Jensen that they, unnamed, unidentified, were out to get her at Al Capri. There's no way you can find from that speculation that Al Capri, particularly the decision-makers Stanford and Taylor, whom the plaintiff admits didn't have an issue with her, who the plaintiff actually testified were telling her, hey, look, if people are coming to get you, report it to us. Just the opposite of having a retaliatory motive. There's no way the they in her declaration can be ascribed to those two individuals on the assumption that it had to be somebody in management because otherwise the verb get wouldn't have had any meaning in the statement. The statement's two levels of hearsay. Frankly, it should have been stricken. It's hard to square any of it. I would like to add, just because I think it has come up, and the Iowa Supreme Court has clarified its standard on retaliatory motive, and the standard is now a motivating factor, not a substantial factor. I believe, if you count noses in that case, it's a little bit confusing. It's a very long opinion, but I believe the concurrence of Judge Cady is the fourth vote, and I believe if you read it all together, the motivating factor is something more than simply it played a part in the analysis. It has to be a motivating factor, and in that regard, I don't believe it's materially different than the standard that Judge Reed applied, and as I said at the outset, frankly, I don't care what standard it's measured under. There's no evidence, no evidence to attach a retaliatory motive to the decision-makers in this case, Stanford and Taylor. Yeah, just to make sure I understand your point there on the standard, that you say it's not materially different from what Judge Reed applied. Didn't she apply the but-for standard? Well, she did, Your Honor, and let me clarify that. Title VII under the Supreme Court's decision in Nassar is but-for on retaliation cases. Did she apply a different standard on the state claim? She did. She applied a substantial factor standard. I think you're right that the Cady opinion does say, well, I don't know. Like I said, it's 173 pages between the three opinions. I did read it. It might say that motivating factor is no different than substantial factor. Is that your point? Your Honor, I don't believe that's actually right. I think what Cady said is different than the separate concurrence of, I believe it's Apple. What Cady said is motivating factor is something more than it merely played a part in, which was some dicta in some prior case law in the state of Iowa, and that it actually has to have been a motivating cause. That standard, when you combine it with the majority that wanted to apply the substantial factor standard, which is the standard that Reed used, I think it's not materially different. They looked to motivation. It wasn't just this all played a part in it. It actually had to motivate the decision maker in some way. But again, Your Honors, I want to be very clear, motivating, substantial, it doesn't matter in our point of view, but for, obviously, we don't think there's any evidence in this record that ascribes or from which an inference can be drawn that there was a retaliatory motive on behalf of the two decision makers. The circumstantial case that Mr. Lyons outlined before you all in his presentation, those facts may exist, inferences can be drawn with regard to them, but there's a gap. You can't get to the two decision makers at issue because there's nothing that links those to the alleged retaliatory motive other than, as Mr. Lyons, I think, argued, the mistake in the ultimate reason. But for the reason that Judge Reed found, that mistake, if it was honest, isn't problematic. It's immaterial and it doesn't change the fact that there's no evidence of a retaliatory motive. Your Honors, I don't have anything further to say. I have a little bit of time left. I don't know if there's further questions that you all may have, but I'd be happy to answer them if there are. I don't see any. Thank you very much for your time today. Mr. Lyons? I would like to address two points in that regard. On the subject of Patty Jensen saying that she never believed that Mr. Stanford and Mr. Taylor were against her. Clearly, when the two of them acting together terminated her, that let her know that they were against her, at least at that point. What she was trying to say in her deposition is that she never would have believed those people were against her prior to that time. She did clear up that mistaken understanding in her deposition. Now as far as getting into Mr. Taylor's mind at the time of termination, it would be easier maybe to get into Mr. Taylor's mind about it had he spoken to Ms. Jensen before the termination decision was made. Ms. Jensen has been adamant that she didn't even know that a problem existed. She didn't know that she had been actually terminated the day before when Mr. Taylor called her on August 27th to inform her for some reason that she was on a three-day investigative suspension. So if there was an investigation that went on, Ms. Jensen wasn't any part of it. And frankly, that would have cleared the entire thing up. Mr. Stanford testified that he didn't actually remember what he did in terms of an investigation in this case. But he said that one of the things that he would have done was talk to Ms. Jensen to see what was going on. But in fact, as part of the investigation, no one actually talked to Ms. Jensen. And I think that's at least suggestive that something else is going on. Because even Mr. Stanford said that, yeah, that would have been part of my investigation to talk to Ms. Jensen, and he didn't recall whether or not he actually had, but Ms. Jensen recalls very well that he didn't. So, unless the court has any more questions, I see that my time has expired. Thank you, counsel. Thank you. The court thanks both sides for the argument you provided to the court this morning. We will take the case under advisement and render a decision.